UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN POPOVICH, *et al.*, | ) | Case No.: 1:02 CV 359 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| SONY MUSIC ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Currently pending before the court is Defendant Sony BMG's ("Sony" or "Defendant") motion to exclude Plaintiffs' Stephen Popovich and Popovich Music Group's ("Popovich" or "Plaintiffs") expert damages witness, Ronald DiMattia, from testifying at trial. (ECF No. 265). The court held a *Daubert* hearing on Tuesday, May 4, 2005, at 1:00 p.m., during which oral argument was heard on the motion. For the reasons stated below, Sony's Motion is granted in part and denied in part.

**I. FACTS**

At the heart of this litigation is a basic contractual dispute between Popovich and Sony. Popovich brought the recording artist Meat Loaf to Sony, and Popovich retained certain rights with respect to any Meat Loaf albums released by Sony. According to Popovich, Sony agreed to place the logo of Popovich's

record company, Cleveland Entertainment[1], on certain Sony CDs, and Sony failed to do so. Further factual details are laid out in the court's prior Orders in this matter. (*E.g.,* ECF Nos. 256 317, 335.)

Ronald DiMattia, the expert Sony is challenging, prepared an expert report which:

> is intended to calculate the amount of the loss, or damages, suffered by the Plaintiffs as a result of Sony Music's actions. This report also addresses Sony's claim of 'inadvertent omission' and the amount of profit Sony generated on the CDs in question.

(DiMattia Report at 2.) DiMattia has also filed a supplemental report in which he calls into question the lack of independence of Sony's damages expert.

## II. LAW AND ANALYSIS

### A. Expert Testimony Standard

The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharm. Inc*, 509 U.S. 579, 592 n.10 (1993); 2000 Advisory Notes to Fed. R. Evid 702. Federal Rule of Evidence 702 outlines the basic standard for the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In analyzing any expert's proposed testimony under this rule, the judge performs a gatekeeping function by considering the relevance and reliability of the expert testimony. *E.g., Kumho Tire*

---

[1] The trade name of Cleveland Entertainment is Cleveland International Records ("CIR").

*v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). The Sixth Circuit elaborated on this requirement as follows:

> The relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. *See United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993). The reliability requirement is designed to focus on the methodology and principles underlying the testimony. *See id.* at 556.

*Greenwell,* 184 F.3d 496-97. In a case where there is no hard scientific evidence, it is up to the trial court to rely on the scientific criteria from *Daubert* and to craft reasonable additional criteria to be used to determine reliability based on the particulars of the case. *See Kumho Tire*, 526 U.S. at 158.

The court notes, however, that although "the rejection of expert testimony is the exception rather than the rule," trial courts do have broad discretion to decide whether or not to admit expert testimony. *See, e.g.,* 2000 Advisory Committee Notes to Fed. R. Evid. 702; *Hamling v. United States*, 418 U.S. 87 (1974).

### B. Ronald DiMattia

DiMattia's reports[2] opine on a wide variety of subjects. The first portion of his report outlines the prior litigation and Popovich and CIR's background. (DiMattia Report at 3-8.) DiMattia next discusses Sony's history and business practices, as well as recent developments in the music industry. (*Id.* at 9-30.) DiMattia goes on to opine that Sony's failure to place the CIR logo on the appropriate CDs was not an "inadvertent exclusion." (*Id.* at 30-31.) Finally, DiMattia's report proposes three alternative methods of valuing Plaintiffs' contractual damages, outlines their methodologies, and estimates the resulting damages.

---

[2] DiMattia filed his original report on January 29, 2004, as well as supplements on March 1, 2004, March 22, 2005, and April 22, 2005.

(*Id.* at 32-42.) DiMattia's supplemental report criticizes the independence of Sony's expert on damages, Jill Voigt, and also identified flaws in Voigt's report.

Sony challenges the admissibility of DiMattia's testimony on multiple bases: (1) he is not qualified to serve as an expert; (2) the factual bases for his analysis and conclusions are insufficient, unverified, and unsupported; and (3) the methodology he uses is flawed. The court will analyze Sony's challenges in the context of the subject areas contained in DiMattia's reports.

1. Qualification

Sony contends that DiMattia is not qualified to testify as an expert in this case. They argue that he has no music industry experience, no experience in advertising or marketing, no expertise in trademark or copyright, and only one experience with valuation of a logo.

DiMattia is the founder and president of a corporate valuation firm. He is a certified public accountant and holds accounting and business administration degrees from the University of Michigan. (DiMattia Report at 43.) He is accredited in business valuation and has twenty years of experience in business valuation and the development of business forecasts and projections. (*Id.*) He has served on the business valuation subcommittee of the American Institute of Certified Public Accountants. (*Id.* at 44.) The court finds that DiMattia is qualified as an expert in business valuation. Sony argues that this is not enough, since DiMattia is effectively evaluating a contract right or a logo rather than a business, and DiMattia admittedly has minimal, if any, experience in these areas. (DiMattia Dep. at 21-23.) Despite this, the court is convinced that DiMattia's extensive experience in business valuation, including valuation of business units and business assets, is sufficient to qualify him as an expert on the value of the contract right in this case. DiMattia is unlike Popovich's proposed musicologist expert, Graeme Boone, who the court rejected as

unqualified in a previous order (ECF No. 335). Determining the historical significance of rock artists and evaluating consumer CD buying preferences is significantly outside of what Boone does every day; in contrast, valuing business assets such as contract rights is closely related to what DiMattia does every day. DiMattia is qualified as a valuation expert.

Although DiMattia is qualified in the area of valuation, there are several notable areas in which the court finds him unqualified to testify as an expert. DiMattia is not an expert on the music industry. (DiMattia Dep. at 7-8.) He is not a lawyer, was not involved in the creation of the contracts at question in this suit, and is not an expert on contract interpretation. He is not a historian or a musicologist. He is not an expert on marketing or advertising. He is not an expert on corporate operations or strategy. He is not an expert on accounting ethics or ethics generally. He is a valuation expert only, and therefore the court finds DiMattia unqualified to testify as an expert about any topic except for those specifically and tightly related to his valuation of Plaintiffs' damages. The court understands that many of the additional matters presented in DiMattia's report are merely the factual predicates on which DiMattia's analysis is based. DiMattia may rely on these factual predicates, but only if they are established by other witnesses or facts presented at trial. Popovich may not rely on DiMattia to opine as to what the contracts mean, whether Sony intentionally breached them, what Popovich's historical significance was, what Sony's corporate strategy is, what the recent trends in the music industry are, or whether Sony's damage expert breached any ethical codes. These matters are well outside the scope of DiMattia's expertise.[3]

---

[3] This list is not an exhaustive list of what DiMattia may not testify about, but a summary of the basic topics on which the court finds he is not qualified to testify. As the court noted, the only permissible topics are those specifically and tightly related to the damage valuation, and this *does not* include any opinion about the intent / inadvertence of Sony's behavior.

2. Factual Basis for Analysis / Conclusions

Sony contends that the information relied upon by DiMattia to reach his opinions was unreliable and unsupported by fact. For example, Sony asserts that DiMattia's conclusions about the meaning of the contract, Popovich's significance, and music industry trends and customs are simply recitations of Popovich's own conclusions. Sony also questions DiMattia's conclusion that the failure to place the CIR logo on Meat Loaf CDs was not "inadvertent," contending that he had no factual basis upon which to reach his conclusion. Sony also challenges some of the information DiMattia used to calculate Popovich's contractual damages, arguing that much of it is from a general book on the music industry and not from any data specific to Sony.

The court first notes that it is not uncommon for an expert to rely on data presented by the party who hired him as a basis for his expert analysis. Popovich hired DiMattia, provided him with Popovich's version of the facts of the case, and asked him to estimate damages. Although DiMattia may not have verified these facts, it was proper for DiMattia to rely on them in his analysis. This is unlike the situation of the musicologist Graeme Boone, who knew nothing about the specific subject matter to which he claimed to have expertise, the historical significance of Meat Loaf and CIR, and was given information on the subjects from which to form an opinion. Here, DiMattia knew nothing about Popovich and the logo dispute, but did know how to value businesses and business assets. Therefore, it was appropriate for DiMattia to take the information given to him by Popovich and estimate damages based on it. However, as stated

above, it is not appropriate for DiMattia to testify as to these facts or conclusions as to which he has no expertise.

DiMattia's opinion that Sony's actions were not "inadvertent," however, is without any factual support and is purely based on speculation. His analysis is based on a review of publicly available information about Sony and no information about Sony's specific intent or behavior with regard to the CIR logo. (*See* DiMattia Report at 30-31.) He did not review deposition testimony from Sony employees regarding the logo placement, or internal correspondence regarding the logo. (DiMattia Dep. at 383-84.) Rather, he strings together a chain of assumptions based on articles or other publicly available information to infer that Sony's actions must be intentional. The court finds that not only is DiMattia unqualified to opine on this subject, but he has no specific or direct knowledge or information about Sony's intentions with respect to the placement of the CIR logo, and his opinion is wholly unsubstantiated.

Sony also challenges the data and assumptions DiMattia puts into his valuation calculations. DiMattia relies on publicly available information about music industry cost breakdowns, advertising spending, and profits to make assumptions necessary to making an estimate on damages. While the data and assumptions used by DiMattia may not be perfect, perfect information is not always available, and making assumptions based on the best available data is commonplace. The court believes that rather than rendering its own judgment as to whether DiMattia's data and assumptions are accurate, the proper way to proceed is to permit DiMattia to testify. *E.g., Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188-89 (2d Cir. 1992); *Coleman v. Dydula*, 139 F.Supp.2d 388, 395 (W.D.N.Y. 2001). Sony may vigorously cross examine him regarding his assumptions if it sees fit. The subject matter of DiMattia's

testimony is not so scientific in nature that effective cross examination will not be able to point out any potential shortcomings to a jury.

There is one set of assumptions, however, which do not appear to be based on any publicly available information, methodology, or any other admissible evidence. DiMattia estimates that 10% of all purchasers of a Meat Loaf CD with a CIR logo would have "bought through" and purchased a release by CIR. (DiMattia Rep. App. A.) He further estimates that five percent of all Meat Loaf CD purchases would be repeat customers and buy multiple CIR releases. Finally, he estimates that the lost opportunity to sign artists would have resulted in 5,000 additional CIR album sales in 1998, 10,000 in 1999 and 2000, and 20,000 in 2001, 2002, and 2003. *Id.* However, DiMattia does not describe the source for these estimates anywhere in his report. As discussed, DiMattia is a valuation expert, not an expert on the music industry. Therefore, he is unqualified to make any assumptions about "buy through" or artists who might have signed with CIR, particularly in the absence of any discussion or analysis as to the source of those assumptions. DiMattia may not testify regarding his assumptions about profits from sales of other recordings or from signing other acts.

3. Methodology

In addition to challenging the data DiMattia uses to estimate damages, Sony challenges the methodology behind DiMattia's analysis, claiming he uses a "made up" methodology with concepts and terms not commonly used in the business valuation field.

DiMattia's report uses three different methods to estimate the value of Popovich's alleged losses: (1) cost / advertising perspective; (2) analogy to custom music CDs; and (3) lost profit / contribution margin. In his report, DiMattia cites a business valuation book for the proposition that the appropriate valuation

method may vary based on the circumstances: "No single valuation method is universally applicable to all appraisal purposes. The context in which the appraisal is to be used is a critical factor." (DiMattia Report at 34, quoting *Valuing a Business,* Fourth Edition, at 27.) Accordingly, DiMattia uses three different methods, and based on his judgment, gives his expert opinion as to what the most accurate range of damages actually is. (*See* DiMattia Dep. at 388.)

The cost / advertising perspective methodology purports to answer the question "based on the revenue associated with the CD's that did not include the Cleveland International logo, how much would a company pay in related advertising and product placement to support the product and the brand?" (DiMattia Rep. at 36.) The analysis begins with the number of CDs manufactured without the logo multiplied by the estimated wholesale price per CD. The analysis then multiplies this wholesale revenue by 5.5%, the relative advertising spent by Sony, to come up with an estimate of damages. (*Id.* at 37.) His latest calculation as of March 2005 is that damages utilizing this method are $6,675,000.

Sony challenges this methodology, alleging that advertising perspective "is not a term that is defined as a business valuation concept" and that "DiMattia appears to have created a methodology...." (Supp. to Def. Sony BMG's Mot. to Excl. Plfs' Expert Witness, ECF No. 333, at 8.) After carefully reviewing DiMattia's report, deposition, supplemental reports, and the arguments of counsel at the *Daubert* hearing, the court cannot identify the basis or source for this methodology. Apart from a statement on the record by Plaintiffs' counsel that DiMattia's methodologies are textbook methods, the record is unclear about where the methodology comes from, whether it is generally accepted, and whether it bears any indicia of reliability. The court will leave the admissibility of the advertising perspective methodology as an open question at this time, but will make a final decision at a conference with the parties immediately before trial.

With respect to the custom music analogy method, DiMattia's methodology is to identify another market transaction similar to the agreement on logo placement, and use the price of that transaction as a proxy for damages. Music companies sell custom CDs to corporate customers who then either sell or give away the CDs, which bear the corporation's name and logo and typically contain music selected by the corporation. DiMattia looks at the prices charged and paid for these CDs and concludes that the price per CD is an effective measure of Popovich's damages. Sony contends that custom CDs are in no way analogous to the logo rights in question. With respect to the methodology, the court notes that Sony's damages expert, Jill Voigt, utilizes a similar valuation-by-analogy methodology to DiMattia. In Voigt's analysis, she identified a market transaction comparable to logo rights on CDs by analyzing the prices paid by companies to get their logos placed on credit cards. Therefore, although Sony may disagree with whether custom CDs are analogous to Popovich's logo rights, its own expert agrees with the basic methodological soundness of analogizing to a comparable transaction in the market to estimate damages. Since the methodology is good enough for Sony's expert, Sony is hard pressed to come up with arguments for excluding it. *See Andrade Garcia v. Columbia Med. Ctr.,* 996 F.Supp.617, 623 (E.D. Tex. 1998).

DiMattia's final methodology, the lost profit / contribution margin analysis, purports to "look at the elements of past and future profit that Cleveland International would have earned had the logo been displayed as agreed upon." (DiMattia Rep. at 39.) The analysis concludes that CIR would have had increased sales of its own CDs, as customers who saw the CIR logo on Meat Loaf CDs would have then sought out and purchased other CIR CDs. Likewise, the analysis concludes Popovich would have profited by signing other acts who were attracted to CIR due to its connection to Meat Loaf. DiMattia estimates that 10% of Meat Loaf CD purchasers would "buy through" and purchase another CIR CD, and multiplies

the number of "buy through" customers by a "contribution margin" to estimate damages. DiMattia earlier defined contribution margin in the context of his analysis of profits earned by Sony per Meat Loaf CD sold, as "an effective measure of the profits that an endeavor 'contributes' to the 'fixed' costs of operating a company. (*Id.* at 32.) In the analysis, DiMattia uses the same contribution margin it earlier identified as Sony's contribution margin to calculate damages for lost sales of CIR recordings.

Sony does not challenge this methodology *per se*, but rather contests the reliability and the relevancy of any evidence regarding its profits from the sale of Meat Loaf CDs. The court finds these concerns well taken. With respect to this particular methodology for analyzing damages, the court fails to understand how Sony's profit or contribution margin is relevant.[4] The analysis seeks to estimate Popovich's lost profits from sales of CDs by his own label. The appropriate profit/contribution margin would be CIR's own profit/contribution margin, not Sony's. Sony's per CD profit has nothing to do with how much CIR would have gained had it sold more of its own CDs. Additionally, as the court noted above, DiMattia is unqualified to render an opinion as to how many Meat Loaf CD purchasers would have bought a CIR release if the logo had been present, or how many artists would have signed with CIR had the logo been present on Meat Loaf CDs. Furthermore, he sets forth no acceptable methodology for how he came up with the numbers. For these reasons, the court finds that DiMattia's lost profit / contribution margin analysis is unreliable under *Daubert* and his testimony on those matters is excluded.

---

[4] The court does not at this time address the broader issue of whether **any** information about Sony's profits from the Meat Loaf CDs is relevant or admissible. The court will resolve this question in response to Defendant's Motion in Limine on that specific question (ECF No. 299).

The court concludes that DiMattia may testify regarding his custom music analysis and may not testify regarding the lost profit / contribution margin analysis, but withholds any decision about the admissibility of the advertising perspective analyses at this time.

### III. CONCLUSION

For the reasons stated above, Sony's Motion is granted in part and denied in part. (ECF No. 265). DiMattia may testify according to the limits identified in this Order.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

May 9, 2005